UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 18-60383-CV-BLOOM
MAGISTRATE JUDGE REID

ERIC LUCAS,

      Petitioner,

v.

MARK S. INCH,[1]

      Respondent.

_____/

## REPORT OF MAGISTRATE JUDGE

### I. Introduction

The Petitioner, **Eric Lucas**, has filed this *pro se* petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his convictions for burglary of a dwelling with a battery and aggravated battery, entered following a jury verdict in Broward County Circuit Court, Case No. 07-0222290CF10A. For the reasons detailed below, the Petitioner is not entitled to habeas corpus relief.

This cause has been referred to the undersigned for consideration and report, pursuant to 28 U.S.C. § 636(b)(1)(B), (C); S.D. Fla. Local Rule 1(f) governing

---

[1]Pursuant to Fed. R. Civ. P. 25(d), since Mark S. Inch has replaced Julie Jones as the Secretary of the Florida Department of Corrections, he is substituted as the proper respondent in this case.

Magistrate Judges; S.D. Fla. Admin. Order 2019-02; and the Rules Governing Habeas Corpus Petitions in the United States District Courts.

For its consideration of the petition [ECF 1],[2] the court has the Respondent's response to this court's order to show cause [ECF 13], along with its supporting appendix [ECF 14; 15], containing copies of relevant state court pleadings, including hearing and trial transcripts.

## II. Claims

Construing the arguments liberally as afforded *pro se* litigants, pursuant to *Haines v. Kerner*, 404 U.S. 519, 520 (1972), the Petitioner raises the following grounds for relief:

1.    Petitioner's constitutional rights were violated when the trial court allowed hearsay evidence to be admitted at trial. [ECF 1, p. 3].

2.    Petitioner's constitutional rights were violated when the prosecutor made multiple improper statements during the trial. [ECF 1, p. 4].

3.    Petitioner received ineffective assistance of counsel when his lawyer failed to consult and/or hire an expert witness in the area of eye injuries. [ECF 1, p. 5].

4.    Petitioner received ineffective assistance of counsel when his lawyer failed to object to the State's introduction of hearsay evidence regarding Lauren Glushko's identity. [ECF 1, p. 7].

---

[2] The Court uses ECF 1 as the operative petition in this case but notes that the Court previously granted Petitioner's motion to amend his complaint [ECF 11; 12]. However, as explained by the Court's order, the amended complaint did not change the substantive claims and facts raised in the initial petition. [ECF 12].

2

5.      Petitioner received ineffective assistance of counsel when his lawyer failed to use a police report to impeach victim Lewisha Freeman regarding her inconsistent statements. [ECF 1, p. 8].

6.      Petitioner received ineffective assistance of counsel when his lawyer failed to object to the admission of recorded jail phone calls. [ECF 1, p. 9].

7.      Petitioner received ineffective assistance of counsel when his lawyer failed to investigate the relationship between Lewisha Freeman and Janet Landry. [ECF 1, p.10].

8.      Petitioner received ineffective assistance of counsel when his lawyer failed to present a viable alibi defense. [ECF 1, p. 12].

9.      Petitioner received ineffective assistance of counsel when his lawyer failed to call Janet Landry to testify at trial. [ECF 1, p. 13].

## III. Procedural History

A jury found Petitioner guilty of burglary of a dwelling with battery and aggravated battery, in violation of Fla. Stat. § 810.02 and § 784.045, following a jury verdict. [ECF 14-1, Exs. 3, 9]. He was adjudicated guilty and sentenced to term of life imprisonment as a prison releasee reoffender. [*Id*., Ex. 9]. On appeal, Petitioner raised two arguments: (1) the trial court erred by allowing the state to introduce Lauren Glushko's out-of-court statements, and (2) the trial court erred by denying a motion for mistrial based on improper prosecutorial comments. [*Id*., Ex. 11]. His judgment of conviction was affirmed in a decision with a written opinion. [*Id*., Ex. 14]; *Lucas v. State*, 67 So.3d 332 (Fla. 4th DCA 2011). Rehearing was denied; and on March 29, 2012, the Florida Supreme Court declined discretionary review. [*Id*.,

Exs. 17, 23]. Therefore, Petitioner's conviction became final on **June 27, 2012**, when the 90-day period for seeking certiorari review with the Supreme Court of the United States expired. *See* Sup. Ct. R. 13; *Gonzalez v. Thaler,* 565 U.S. 134 (2012).

On January 22, 2013, Petitioner filed his first Rule 3.850 motion for post-conviction relief. [*Id*., Ex. 24]. Petitioner argued that he received ineffective assistance of counsel when his lawyer failed to (1) consult or call an ophthalmologist as an expert witness to rebut the state's case; (2) object to the introduction of his jail calls to his girlfriend, Lauren Glushko, because the State failed to identify her voice; (3) impeach the victim, Ms. Freeman, with a police report; and (4) move to dismiss the aggravated battery charge on double jeopardy grounds. [*Id*.]. The trial court struck the motion with leave to amend, finding Petitioner's "expert witness" claim, raised as ground one in the motion, to be insufficiently pled. [*Id.*, Ex. 27]. Petitioner appealed; and the Fourth District Court of Appeal ("Fourth DCA") reversed, holding that Petitioner "sufficiently explained the relevance and substance of the expected testimony [of the expert witness] and alleged that the outcome of the proceedings would have been different." [*Id*., Ex. 33];  *Lucas v. State*, 147 So. 3d 611, 612 (Fla. 4th DCA 2014). The Florida Supreme Court approved the Fourth DCA's opinion on appeal. [ECF 14-1, Ex. 40]; *State v. Lucas*, 183 So. 3d 1027 (Fla. 2016).

On remand, the court granted an evidentiary hearing on Petitioner's expert witness claim, and denied Petitioner's remaining claims based on the state's

response. [ECF 14-1, Ex. 42]. The trial court later vacated the order on request of Petitioner's postconviction counsel to allow for further responses. [*Id*., Exs. 43-44]. Petitioner's postconviction counsel then filed a reply to the State's response to the Rule 3.850 motion, raising a fifth claim (5) that trial counsel was ineffective for failing to object to the introduction of the jail calls on the grounds that the State failed to establish Petitioner's identity.  [*Id*., Ex. 45]. After additional briefing, the trial court summarily denied all of Petitioner's claims based on the state's responses. [*Id*., Exs. 46-48]. That denial was subsequently, *per curiam,* affirmed on appeal. [*Id*., Ex. 52]; *Lucas v. State*, 230 So.3d 1219 (Fla. 4th DCA 2017). On December 6, 2017, the Florida Supreme Court dismissed Petitioner's petition for writ of certiorari for lack of jurisdiction. [ECF 14-1, Ex. 58].

Petitioner then came to the Court filing his initial federal habeas corpus petition on **February 15, 2018**.[3] [ECF 1, p. 1].

### IV. Threshold Issues

A. <u>Timeliness</u>

Careful review of the procedural history of this case confirms that less than one year of un-tolled time expired after the Petitioner's judgment became final and

---

[3]Absent evidence to the contrary, in accordance with the prison mailbox rule, a *pro se* prisoner's filing is deemed filed on the date it is delivered to prison authorities for mailing. *Washington v. United States,* 243 F.3d 1299, 1301 (11th Cir. 2001); Fed. R. App. 4(c)(1).

the filing of this federal habeas petition. Therefore, as the Respondent correctly concedes [ECF 13, p. 6], the petition is timely filed under 28 U.S.C. § 2244(d).

B. Exhaustion

Next, the Respondent argues that several of Petitioner's claims are unexhausted and procedurally defaulted from federal habeas review. [ECF 13, pp. 7-10]. In addressing the issue of exhaustion and procedural default, the court must determine whether the claims raised here were raised in the state court proceedings, and whether the state courts were alerted to the federal nature of the claims.

Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all available state court remedies. See 28 U.S.C. §§ 2254(b), (c). To properly exhaust state remedies, the petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. *Castille v. Peoples,* 489 U.S. 346, 351 (1989); *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 456–59 (11th Cir. 2015).

Exhaustion is not satisfied "merely" if the petitioner presents the state court with "all the facts necessary to support the claim" or even if a "somewhat similar state-law claim was made." *Kelley v. Sec'y for Dept. of Corr.*, 377 F.3d 1317, 1344-45 (11th Cir. 2004) (citation omitted). A petitioner must instead "present his claims to the state courts such that they are permitted the 'opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim.'" *Id*. For example,

"[A] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Baldwin,* 541 U.S. at 32; *McNair v. Campbell,* 416 F.3d 1291, 1302-1303 (11th Cir. 2005).

To circumvent the exhaustion requirement, Petitioner must establish that there is an "absence of available state corrective process" or that "circumstances exist that render such process ineffective to protect [his] rights." 28 U.S.C. § 2254(b)(1)(B); *see Duckworth v. Serrano,* 454 U.S. 1, 3 (1981).

First, the Respondent asserts that part of claim 1 and all of claim 2 are unexhausted because Petitioner failed to raise the federal constitutional terms presented here in state court. [ECF 13, p. 7]. Specifically, regarding claim 1, the Respondent acknowledges that although Petitioner raised a claim that the admission of Lauren Glushko's statements violated his constitutional right to confrontation, he failed to raise a due process violation. [*Id*.]. Petitioner argues, in a conclusory fashion, that the claim is properly exhausted because he sufficiently raised the issue in federal constitutional terms on direct appeal. [ECF 29, p. 2]. Review of the record reveals that while Petitioner did raise a "confrontation" claim regarding the trial court's admission of Glushko's hearsay statements at trial, he failed to raise this issue as a due process violation. [ECF 14-1, Ex.11]. Accordingly, this portion of claim 1

is unexhausted.  *See Kormondy v. Sec'y, Fla. Dep't of Corr.*, 688 F.3d 1244, 1284, n. 37 (11th Cir. 2012) (finding that when § 2254 Petitioner failed to raise due process claim "in the context of the claim at issue" in state court, such a claim is unexhausted and should not be considered).

Regarding claim 2, review of the record reveals that while Petitioner argued on direct appeal that the trial court erred by denying his motion for mistrial regarding the prosecutor's improper statements at trial, he raised the issued only in terms of state law, arguing that *Dunlap v. State*, 21 So.3d 873 (Fla. 4th DCA 2009) was distinguishable from the factual scenario in Petitioner's case. [ECF 14-1, Ex. 11]. Having failed to raise this issue in federal constitutional terms in state court, claim two is also unexhausted. *See Hartge v. McDonough*, 210 F. App'x 940, 943 (11th Cir. 2006) (finding that Petitioner did not fairly present claim regarding prejudicial admission of photographs because he did not alert the state court to the fact that he was asserting federal constitutional claims).

Second, Respondent argues, and the Petitioner concedes, that claims 7, 8 and 9 are unexhausted because they were never presented in state court. [ECF 13, p. 8; ECF 1, pp. 10-15]. Petitioner, however, seeks to excuse the procedural default to his claims by alleging that he was *pro se* when he prepared his initial Rule 3.850 Motion, implicating *Martinez v. Ryan,* 566 U.S. 1 (2012). [ECF 1, pp. 10-15].

C. Procedural Default

It must next be determined whether Petitioner's failure to exhaust his claims results in a procedural default in federal court. Petitioner's unexhausted claims would now be procedurally barred if raised in state forum because he has already completed a direct appeal and a Rule 3.850 motion. *Bailey v. Nagle,* 172 F.3d 1299, 1302-03 (11th Cir. 1999). In this case, a future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. *Bailey v. Nagle,* 172 F.3d at 1303.

However, a procedurally defaulted claim may still be considered if the federal petitioner can demonstrate (1) objective cause for the failure to properly present the claim and actual prejudice from the alleged constitutional violation; or, (2) a fundamental miscarriage of justice. *See Wainwright v. Sykes,* 433 U.S. 72, 87 (1977); *Tharpe v. Warden,* 898 F.3d 1342, 1344–47 (11th Cir. 2018). Petitioner can show cause by alleging that some objective factor, external to the defense, impeded his effort to raise the claim properly in the state court. *See Murray v. Carrier,* 477 U.S. 478, 488, (1986); *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). To show prejudice, a petitioner must demonstrate that the "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." *See McCoy v. Newsome,* 953 F.2d at 1261 (*quoting Murray v. Carrier,* 477 U.S. at 494). The allegations of cause and prejudice must be factually specific, not

conclusory. *Harris v. Comm'r, Ala. Dep't of Corr.,* 874 F.3d 682, 691 (11th Cir. 2017).

In *Martinez v. Ryan,* 566 U.S. 1 (2012), the Supreme Court expanded upon what "cause" may excuse a procedural default, determining that when a state court claim of "ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Martinez v. Ryan,* 566 U.S. at 17. Therefore, relief is available if (1) state procedures make it virtually impossible to actually raise ineffective assistance of trial counsel claims on direct appeal; and (2) the Petitioner's state collateral counsel was ineffective for failing to raise ineffective assistance of trial counsel claims in the state proceedings. *See Lambrix v. Sec'y, Fla. Dep't of Corr.,* 756 F.3d 1246, 1261 n.31 (11th Cir. 2014). To prove that the claim is "substantial," the petitioner must demonstrate that the claim has some merit. *Martinez v. Ryan,* 566 U.S. at 10.

Here, Petitioner makes no showing of cause and prejudice to excuse the procedural default of the portion of claim 1 and claim 2 raised in the instant petition. Regarding claims 7, 8 and 9, it appears that Petitioner means to use *Martinez* to circumvent the procedural default of these claims by alleging that he was *pro se*

when he filed his initial Rule 3.850 Motion. This constitutes sufficient cause pursuant to *Martinez v. Ryan,* 566 U.S. at 17. As such, the Court will evaluate in the discussion section below whether these claims are "substantial" such that Petitioner was prejudiced by his failure to raise them in the state proceedings. *See Martinez*, 566 U.S. at 10.

Moreover, regardless of the procedural default to Petitioner's claims, he may nonetheless receive consideration on the merits "if he can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result." *Ward v. Hall,* 592 F.3d 1144, 1157 (11th Cir. 2010); *see also, McQuiggen v. Perkins,* 569 U.S. 383, 387 (2013). This exception requires the petitioner to demonstrate actual innocence, not just legal innocence. *See Rozzelle v. Sec'y, Fla. Dep't of Corr.,* 672 F.3d 1000, 1011 (11th Cir. 2012). "Only if [Petitioner] can meet the requirements for proving his actual innocence will he 'then be entitled to have his defaulted claim'... considered on its merits." *Id*. at 1285.

Finally, where the merits of the claim may be reached and readily disposed of, judicial economy dictates reaching the merits of the claim while acknowledging the procedural default and bar in the alternative. *See Lambrix v. Singletary,* 520 U.S. 518 (1997). To the extent Petitioner's unexhausted claims are procedurally defaulted, they are without merit, as explained below.

## V. Statement of Facts

A. <u>Pretrial Hearing</u>

Prior to trial, the court held an evidentiary hearing regarding the State's notice of intent to offer evidence concerning Petitioner's battery of his girlfriend, Lauren Glushko, that had occurred immediately before the charged battery in the instant case. [ECF 14-1, Ex. 4]. The State argued that this evidence was necessary to establish Petitioner's motive and intent, and to put the incident in proper context. [*Id.*, p. 16]. The State also filed a motion seeking to admit Glushko's out-of-court statements on the basis that Petitioner actively encouraged Glushko to not cooperate with authorities under the threat of violence. [*Id.*, Ex.5].

Officer Thomas Stenger testified that when he arrived on scene, he found Lauren Glushko crying and upset, with visible bruises and a missing tooth. [ECF 15-2, pp. 1, 4-5, 9]. Glushko told Officer Stenger that at approximately 5:00 a.m., she began arguing with Petitioner, her boyfriend, about a text message that he received from an unknown female. [*Id.*, pp. 6-7]. Petitioner then began slapping her around, grabbed her by the neck, and stated that he was going to kill her. [*Id.*, p. 7]. The altercation between the two of them ensued for approximately fifteen minutes until Glushko was able to run out into the street while Petitioner chased her. [*Id.*]. Eventually, Glushko ran to a nearby apartment building, where she began knocking on doors for help. [*Id.*]. Lewisha Freeman, in apartment 509, let Glushko inside her

apartment and locked the door. [*Id*.]. Petitioner began beating on the door and broke it down. [*Id*.].  Petitioner then attacked Ms. Freeman before driving away from the scene.[4] [*Id*., pp. 7-9].

Detective Moody testified that during the course of his investigation, he attempted to contact Glushko to set up a meeting with her. [*Id*., pp. 13-14]. Glushko told Moody that she was willing to cooperate, but that Petitioner had made threats towards her and that she was afraid of him. [*Id*., p. 14]. Linda Laviano, a victim advocate at the State Attorney's office, testified that Glushko declined to receive any domestic violence services and stated that she did not remember anything about the incident. [*Id*., p. 23].

The trial court permitted the "bad acts" evidence regarding Petitioner's attack on Glushko to be admitted at trial on the basis that (1) the evidence was inextricably intertwined with the battery on Ms. Freeman, and (2) went to prove Petitioner's intent and motive under Fla. Stat. § 90.404. [ECF 14-1, Ex. 6]; *see also* [ECF 15-1, pp. 6-7].   The trial court also found that the probative value of this evidence outweighed any danger of unfair prejudice to Petitioner under Fla. Stat. § 90.403. [*Id*., p. 8]. Finally, the trial court held that Glushko's absence and unavailability as a witness for the prosecution was procured by the Petitioner, and that he waived his

---

[4] Petitioner was convicted of committing aggravated battery against Ms. Freeman, but was not charged with a battery against witness Glushko at trial.

right to confront her as a witness based on the doctrine of forfeiture by wrongdoing. [*Id*., p. 14].

B. Trial

Victim Lewisha Freeman testified that on November 5, 2007, she was living in apartment 509 at Angelina's Apartments, in Fort Lauderdale, Florida. [ECF 15-1, pp. 150-51]. Her apartment was on the first floor. [*Id*., p. 151]. That morning, Freeman awoke around 5:30 a.m. to prepare for work at the apartment complex. [*Id*., p. 152]. She heard a woman, later identified as Glushko, yelling "somebody help me, please help me." [*Id*. pp. 152-53]. Glushko was banging on doors, screaming "he's going to kill me." [*Id*., p. 153]. Freeman went outside and saw the woman crying and yelling. [*Id*.]. She also saw Petitioner, who lived in in the same apartment complex, and whom she recognized as working in the same building as her. [*Id*., pp. 154-155]. She observed Petitioner yelling at Glushko, telling her that she was not going to call the police, pointing his finger at her and then grabbing her throat. [*Id*.]. When Petitioner let Glushko go, Freeman ran into her house to call the police. [*Id*., 156]. Glushko followed her into her apartment and closed the door behind her. [*Id*.]. Glushko and Petitioner were yelling back and forth while Freeman was calling the police. [*Id*.]. Freeman's 911 call was admitted into evidence. [*Id*., pp. 159-160].

After Freeman called 911, she could hear Petitioner screaming at Glushko to come out. [*Id*., p. 168]. He  also screamed at Freeman, telling her that she was gay

and that he would fight her like a man. [*Id*.]. When Janet Landry, Freeman's boss, came to the door, Petitioner left. [*Id*., pp. 168-69]. About five minutes later, Petitioner came back and broke through Freeman's front door. [*Id*., p. 169]. Freeman then ran to the kitchen, but before she was able to grab a knife, Petitioner began punching her in the head. [*Id*., p. 170]. Petitioner continued to batter Freeman, repeatedly punching her and kneeing her in her eye. [*Id*., pp. 170-71]. The battery concluded when Landry came inside the apartment and Petitioner ran. [*Id*., p. 171]. Glushko was locked in Freeman's bathroom. [*Id*.].

Freeman was hospitalized for three days as a result of the beating. [*Id*.]. She is required to wear an eye patch because the assault caused a bone to crack in her eye orbit such that she can no longer focus both of her eyes at the same time.  [*Id*., pp. 171-172]. Because of her injury, Freeman suffers from daily pain and migraines. [*Id*. p. 172]. Freeman testified that she could not afford surgery necessary to fix her eye, and that as a result, her condition had worsened. [*Id*., p. 173].

Next, Officer Thomas Stenger testified that he responded to the scene on the date of the incident. [*Id*., p. 195]. He observed Glushko, frightened, panicking and hysterical. [*Id*., p. 196]. Glushko was bleeding, had bruises on her face and arms, and a missing tooth. [*Id*.]. Stenger's photographs of her injuries were admitted into evidence. [*Id*., p. 197]. Glushko told Stenger that she had an argument with Petitioner and that he pushed her and slapped her, grabbed her by the neck, and stated that he

was going to kill her. [*Id*., p. 200]. Glushko explained to Stenger that she was able to escape the apartment, but Petitioner continued the assault. [*Id*.]. Glushko ran to the adjacent apartment building and began knocking on doors, hoping someone would help her. [*Id*., p. 201]. Freeman, in apartment 509, let Glushko inside and locked the door. [*Id*.]. Petitioner broke the door down and assaulted Freeman inside the apartment. [*Id*.]. At the scene, Stenger observed Freeman's broken door and broken dead-bolt. [*Id*., p. 202]. Freeman had a swollen eye; and Stenger contacted EMS to transport her to the hospital. [*Id*., p. 206].

Dr. John Clarke, an oral maxillofacial surgeon, testified that Freeman was admitted to the emergency room because of her left eye injury and was prescribed Dilaudid for her pain. [*Id*., p. 217]. A CAT scan revealed that she had a fracture of the orbital floor, the bone just beneath the eye and just above the maxillary sinus. [*Id*., p. 218]. Freeman also had a fracture of the medial wall of the orbit and was bleeding from the eye into the maxillary sinus. [*Id*.]. Freeman's left eye was so completely swollen and closed that Dr. Clarke had to forcibly push her eye up to examine it. [*Id*., p. 219]. Clarke consulted an ophthalmologist, who reported that Freeman was complaining of double vision and photophobia. [*Id*., pp. 219-220].

Clarke, however, testified that she did not need surgery on the bone around her eye. [*Id*., p. 220].

Detective Moody testified that he reported to the scene and observed the door completely broken, and blood on the floor of the apartment. [*Id*., p. 225]. Moody attempted to contact Glushko to take a statement from her, but never got a response. [*Id*., p. 226]. On November 9th, four days after the incident, after she was discharged from the hospital, Freeman identified Petitioner as the assailant in a photographic line-up. [*Id*., p. 227]. Moody, who had interviewed Petitioner, also identified him as the male voice in several jail phone calls that were admitted into evidence. [*Id*., pp. 230-31, 239-40].

Kathleen Casey, who operates the jail's communications system [*Id*., p. 246-47], explained the jail's recording system. [*Id*., pp. 247-49]. She pulled recordings of phone calls made by Petitioner to a phone number registered to Glushko. [*Id*., pp. 287-88]. Several of the recordings were published to the jury. [*Id*., p. 291].

In the first phone call, which appears to have taken place after she had spoken with authorities, Glushko told Petitioner that she thought she was "supposed to be honest"; and Petitioner cursed at her, questioning why he would need her to "say what really happened," and "how is that gonna benefit me?" [*Id*., pp. 291-94]. After the call ended abruptly, Petitioner called back, asking "Why would you go there and tell the truth, you f---- idiot? Think about it. How is that gonna benefit me?" [*Id*., p.

295]. Glushko stated that Petitioner's lawyer told her she had to attend; and the Petitioner said his lawyer "told my old girl for you to call there and there would be no problem with you getting out of it." [*Id*., pp. 296-97]. Glushko explained that the man who served her with a subpoena told her that if she could not make it, she should reschedule, and the assistant state attorney told her that she had to be there. [*Id*., p. 298]. Petitioner then told her that they are lying and that she should read the Declaration of Independence to learn her rights. [*Id*., pp. 299-300]. He told her "I wouldn't be in this s---- if you didn't have fucking issues with your fucking brain, running down the hallway like a f---- jackass." [*Id*., p. 301]. Glushko told Petitioner that she is scared [*Id*., p. 302], and he told her to "plead the Fifth Amendment." [*Id*., p. 306]. In response, Glushko asked, "so, you're telling me to go to this lady and plead the Fifth?" [*Id*.]. Petitioner responded, "I don't care where it happens, that is what you say. I don't give a f---- if you are on the stand in the courtroom." [*Id*., p. 307]. Glushko responded, "Honestly, I don't even know why this is happening. Like didn't I sign something?" (an apparent reference to a non-prosecution affidavit she previously signed). [*Id*.].

Near the end of the call, Petitioner told Glushko, "If you f---- me up, you better hope I never come out." [*Id*., p. 312]. Petitioner told Glushko to promise that she

was "not going to answer anything," and to "[j]ust remember the Fifth Amendment

s----, okay?" [*Id.*, p. 320]. Glushko responded: "I promise you." [*Id.*].

## VI. Governing Legal Principles

A. <u>Standard of Review</u>

The court's review of a state prisoner's federal habeas corpus petition is

governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See*

*Abdul–Kabir v. Quarterman,* 530 U.S. 233, 246 (2007); *Ledford v. Warden, Ga.*

*Diagnostic & Classification Prison,* 818 F.3d 600, 642 (11th Cir. 2016), *cert. den'd,*

137 S.Ct. 1432 (2017). AEDPA ensures that federal habeas corpus relief works to

"guard against extreme malfunctions in the state criminal justice systems, and not as

a means of error correction." *See Greene v. Fisher,* 565 U.S. 34, 38 (2011). This

standard is both mandatory and difficult to meet. *White v. Woodall,* 572 U.S. 415,

420 (2014).

Deferential review under § 2254(d) is generally limited to the record that was

before the state court that adjudicated the claim on the merits. *See Cullen v.*

*Pinholster,* 563 U.S. 170, 182 (2011); *Gill v. Mecusker*, 633 F.3d 1272, 1288 (11th

Cir. 2011). To review a federal habeas corpus claim, the district court must first

identify the last state court decision, if any, that adjudicated the merits of the claim.

*See Marshall v. Sec'y, Fla. Dep't of Corr.,* 828 F.3d 1277, 1285 (11th Cir. 2016).

The state court is not required to issue an opinion explaining its rationale, because

even the summary rejection of a claim, without explanation, qualifies as an adjudication on the merits that warrants deference. *See Harrington v. Richter,* 562 U.S. 86, 100 (2011); *Ferguson v. Culliver,* 527 F.3d 1144, 1146 (11th Cir. 2008). Where the state court's adjudication on the merits is unaccompanied by an explanation, federal courts must "look through the unexplained decision to the last related state-court decision that does provide a rationale" and, "then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers,* 138 S.Ct. 1188, 1192 (2018). Thus, if the relevant state-court decision on the merits is not accompanied by a reasoned opinion, because it was summarily affirmed or denied, a federal court "should 'look through' the unexplained decision to the last state-court decision that does provide a relevant rationale." *Id.*

Where the claim was "adjudicated on the merits," in the state forum, § 2254(d) prohibits re-litigation of the claim unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or, (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Harrington v. Richter,* 562 U.S. at 97-98.

A state court decision is "contrary to" established Supreme Court precedent when it (1) applies a rule that contradicts the governing law set forth by the Supreme Court; or (2) confronts a set of facts that are materially indistinguishable from a

decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" of clearly established federal law is different from an incorrect application of federal law. *Williams v. Taylor*, 529 U.S. at 410. Consequently, "[a] state court's determination that a claim lacks merit precludes federal habeas corpus relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Mitchell v. Esparza,* 540 U.S. 12, 16 (2003); *Tharpe v. Warden,* 834 F.3d 1323, 1337 (11th Cir. 2016), *cert. den'd,* 137 S. Ct. 2298 (2017) (accord). In other words, if the last state court to decide a prisoner's federal claim provides an explanation for its merits-based decision in a reasoned opinion, "a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson v. Sellers,* 138 S. Ct. at 1192. As applied here, to the extent Petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under § 2254(d).

B. Ineffective Assistance of Counsel Standard

Here, Petitioner also raises multiple claims challenging counsel's effectiveness during all stages of the proceeding. The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the assistance of counsel during criminal proceedings against them. *Strickland v. Washington,* 466 U.S. 668, 684–85 (1984). When assessing counsel's performance under *Strickland,*

the court employs a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. A § 2254 Petitioner must provide factual support for his contentions regarding counsel's performance. *Smith v. White,* 815 F.2d 1401, 1406–7 (11th Cir. 1987). Bare, conclusory allegations of ineffective assistance are insufficient to satisfy the *Strickland* test. *See Boyd v. Comm'r, Ala. Dep't of Corr.,* 697 F.3d 1320, 1333–34 (11th Cir. 2012).

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance." *Burt v. Titlow,* 571 U.S. 12, 20 (2013). "Where the highly deferential standards mandated by *Strickland* and the AEDPA both apply, they combine to produce a doubly deferential form of review that asks only 'whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.'" *Gissendaner v. Seaboldt,* 735 F.3d 1311, 1323 (11th Cir. 2013).

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that: (1) his counsel's performance was deficient, falling below an objective standard of reasonableness; and, (2) he suffered prejudice resulting from that deficiency. *Strickland,* 466 U.S. at 687-88. Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. *Strickland* at 690-91. To uphold a lawyer's strategy, a court need

not attempt to divine the lawyer's mental processes underlying the strategy, because there are "countless ways to provide effective assistance in any given case." *Strickland,* 466 U.S. at 689.

To establish deficient performance, the movant must show that, in light of all circumstances, counsel's performance was outside the wide range of professional competence. *Strickland, supra. See also Cummings v. Sec'y for Dep't of Corr.,* 588 F.3d 1331, 1356 (11th Cir. 2009). The Court's review of counsel's performance should focus on "not what is possible or what is prudent or appropriate but only [on] what is constitutionally compelled." *Chandler v. United States,* 218 F.3d at 1313; *Burger v. Kemp,* 483 U.S. 776 (1987). Counsel is not ineffective for failing to raise non-meritorious issues. *Chandler v. Moore,* 240 F.3d 907, 917 (11th Cir. 2001). Counsel is also not required to present every non-frivolous argument. *Dell v. United States,* 710 F.3d 1267, 1282 (11th Cir. 2013).

Regarding the prejudice component, the Supreme Court has explained "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. A court need not address both prongs of *Strickland* if the defendant makes an insufficient showing

on one of the prongs. *Strickland,* 466 U.S. at 697. *See also Brown v. United States,*

720 F.3d 1316, 1326 (11th Cir. 2013).

## VII. Discussion

> ### Claim 1:    *Petitioner's constitutional rights were not violated when the court allowed hearsay evidence to be admitted at trial.*

In **claim 1,** the Petitioner asserts that the trial court erred when it permitted

Officer Stenger to testify as to Lauren Glushko's statements implicating Petitioner

immediately following the incident. [ECF 1, pp. 3-4]. Petitioner claims that this

testimony was impermissible because (1) forfeiture by wrongdoing is not statutorily

recognized in Florida, (2) Petitioner was denied his constitutional right to

confrontation, and (3) Glushko's statements did not satisfy any of the hearsay

exceptions. [*Id*.].

Petitioner raised this claim on appeal. [ECF 14-1, Ex. 11]. In its written

opinion affirming Petitioner's judgment of conviction, the Fourth DCA found that

the trial court did not err in admitting Glushko's statements to the police because

they fell under the "excited utterance" exception to the Florida Evidentiary Code,

having been made immediately after the stress and excitement of Petitioner's attack

on Glushko and Freeman. *See Lucas v. State*, 67 So.3d 332, 335-36 (Fla. 4th DCA

2011). The statements, made "within five to ten minutes of [Officer Stenger's]

dispatch to the scene," were made "without time for reflective thought" to contrive

or misrepresent. *Id*. at 336 (internal quotations omitted). Moreover, the Fourth DCA

also noted in a footnote that the trial court's admission of Glushko's statements did not violate the confrontation clause because Petitioner "wrongfully procured [her] unavailability" at trial under the doctrine of forfeiture by wrongdoing. *Id.* at n.1.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. Under federal law, the admission of a hearsay statement made by a declarant who does not testify at trial violates the Sixth Amendment if (1) the statement is testimonial, (2) the declarant is unavailable, and (3) the defendant lacked a prior opportunity for cross-examination of the declarant. *Crawford v. Washington*, 541 U.S. 36, 61 (2004). "Only [testimonial statements] cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821 (2006) (citing *Crawford*, 541 U.S. at 51).

Under federal common law, however, an exception to the general confrontation rule exists for "forfeiture by wrongdoing," "when the defendant engaged in conduct designed to prevent the witness from testifying." *Giles v. California*, 554 U.S. 353, 359 (2008). This common law exception is codified by the Federal Rules of Evidence, which apply a hearsay exception when a defendant "engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Fed. R. Evid. 804(b)(6). The forfeiture

doctrine permits the admission of testimony even if the testimony is unconfronted and would otherwise violate the confrontation clause and *Crawford*. *See Giles*, 554 U.S. at 373.[5]

As previously discussed, the jail calls played at trial evidenced Petitioner's specific intent to prevent Glushko from testifying against him at trial. His threats towards Glushko were "conduct designed" to prevent her from testifying. *See Giles*, 554 U.S. at 359. But for Petitioner's wrongful conduct, Glushko herself would have come to court to testify as to the circumstances of the incident, and would have identified Petitioner as the perpetrator. Because Petitioner made her unavailable as witness, Officer Stenger was permitted to testify as to her statements, even though her statements otherwise would have been hearsay. The trial court did not err by permitting Officer Stenger to testify as to Glushko's statements at trial.[6]

───────────────────────

[5] In *Giles*, the Supreme Court of the United States declined to hold that the confrontation clause barred the admission of unconfronted testimony that would otherwise be admissible under the forfeiture doctrine. In doing so, the Supreme Court cited to various prior cases, and stated that in "the absence of even a single case *declining* to admit unconfronted statements of an absent witness on wrongful-procurement grounds…we are not persuaded to displace the understanding of our prior cases that *wrongful procurement permits the admission of prior unconfronted testimony*." 544 U.S. at 373 (emphasis added).

[6] To the extent that Petitioner argues that doctrine of forfeiture was not statutorily recognized in Florida at the time of trial, such an argument is unpersuasive. Upon habeas review, the Court does not look to whether the trial court properly applied state law. Rather, the relevant inquiry is whether the trial court's decision resulted in an unreasonable application of clearly established *federal* law. *Williams v. Taylor*, 529 U.S. at 410.

Moreover, the trial court did not err by admitting Glushko's statements to Stenger under the excited utterance exception. Specifically, an excited utterance, which is a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition," is admissible pursuant to Fla. Stat. § 90.803(2). Generally, to be admissible under the excited utterance hearsay exception, the out-of-court statement must be made while the declarant is under the stress of the startling event and without time for reflective thought. *See Hutchinson v. State*, 882 So.2d 943, 951 (Fla. 2004). The rationale for this exception is that a statement made during a period of excitement is likely to be more reliable than a statement made after a period of reflection. *See Evans v. State*, 838 So.2d 1090 (Fla. 2002). A statement made during a period of excitement is therefore less likely to be contrived. *State v. Lopez*, 974 So.2d 340, 345 (Fla. 2008).

Under federal law, however, the mere fact that evidence meets the requirements of an exception to the hearsay rule does not necessarily mean it is admissible as evidence. As discussed above, the statement might be inadmissible for other reasons, including that the use of the statement, if it is "testimonial" in nature, would violate the defendant's constitutional right of confrontation. *Crawford*, 541 U.S. at 68. The manner in which a state trial court conducts proceedings regarding the admissibility of evidence is a matter of state law and not cognizable in a writ of

habeas corpus unless the hearing and ultimate ruling rendered the trial fundamentally unfair. *Alderman v. Zant,* 22 F.3d 1541, 1555 (11th Cir. 1994).

In this case, the admitted statements were made immediately after the inciden without any opportunity for Glushko to contrive or misrepresent. Moreover, Petitioner had just attacked Glushko and Freeman, who needed emergency assistance. Such statements are nontestimonial in nature and are not covered by the confrontation clause. *See Michigan v. Bryant*, 562 U.S. 344, 358 (2011) (citing *Davis* to explain that statements made during the course of an ongoing emergency are not testimonial because their "purpose is not to create a record for trial"). Therefore, even if the forfeiture doctrine did not apply to Glushko's statements, the testimony still would have been properly admitted.

Given the foregoing, the admissibility of Glushko's statements at trial was not contrary to federal law and did not render Petitioner's trial fundamentally unfair. Accordingly, the State court's rejection of this claim should not be disturbed here. *Williams v. Taylor*, supra. Claim 1 should be denied.

> ### Claim 2:   *Petitioner's constitutional rights were not violated when the prosecutor made multiple improper statements during the trial.*

In **claim 2,** Petitioner asserts that the trial court violated his constitutional rights by permitting the prosecutor to make improper statements during trial, which taken together, led the jury to believe that it could convict Petitioner with less proof than required by the beyond-a-reasonable-doubt standard. [ECF 1, p. 4].

Specifically, Petitioner claims that the prosecutor made multiple improper statements that were overly prejudicial during the course of the trial. [*Id*.]. First, Petitioner claims that during opening argument, the prosecutor commented that the jury's purpose was to find out the "truth" about what Petitioner had done, and told the jury "I know you will do the right thing." [*Id*.]. Second, Petitioner asserts that during closing argument, the prosecutor vouched for Glushko's credibility when she stated that Glushko had told Officer Stenger the truth, commented that the "truth" had now extinguished the presumption of innocence, and told the jury "I know you will do the right thing." [*Id*.]. As discussed in the exhaustion section above, this claim was raised by Petitioner on direct appeal only in terms of state law, where the Fourth DCA found no reversible error. *Lucas v. State*, 67 So.3d 332, 336 (Fla. 4th DCA 2011).

The standard for federal habeas corpus review of a claim of prosecutorial misconduct is whether the alleged actions rendered the entire trial fundamentally unfair. *Donnelly v. DeChristoforo*, 416 U.S. 637, 642-45 (1974); *Hall v. Wainwright*, 733 F.2d 766, 733 (11th Cir. 1984). In assessing whether the fundamental fairness of the trial has been compromised, the totality of the circumstances are to be considered in the context of the entire trial, *Davis v. Zant*, 36 F.3d 1538, 1551 (11th Cir. 1983). "Such a determination depends on whether there is a reasonable probability that, in the absence of the improper remarks, the outcome of the trial

would have been different." *Williams v. Weldon*, 826 F.2d 1018, 1023 (11th Cir. 1988).

Review of the record reveals that during opening statements, the prosecutor told the jury that their purpose was to "find out about the truth" and that she knew the jury would "do the right thing." [ECF 15-1, pp. 145, 148]. During closing argument, the prosecutor made the following comments:

> Five minutes after Officer Stenger was dispatched, he was on scene. And Ms. Glushko met him and told him what happened and who did it. And those phone calls tell you who did it as well. And *tells the truth* that came out.
>
> …
>
> Apply it to the evidence. Apply it in this case. And you will see that Ms. Freeman has nothing to gain. Her testimony is supported by all of the other evidence. And just because the defendant is presumed innocent at the start of the trial, we're coming to the close of that time, *at the end of the instruction from the judge, you no longer have to presume him innocent*.
>
> …
>
> If you believe the evidence has not shown that he is not presumed innocent does not mean he's actually innocent and *the time for that is over*.
>
> …
>
> When you review that evidence, you will see absolutely that he is guilty of burglary of a dwelling with a battery, guilty of aggravated battery, and not guilty of a lesser. I thank you so much or your time and for your attention. And *I know that you will do the right thing*.

[*Id.*, pp. 378-380] (emphasis added). The trial court overruled all of counsel's objections to these statements, and denied counsel's motion for mistrial. [*Id.*, p. 380].

It is worth noting that at the start of the trial, and again immediately before closing argument, the trial court clearly and correctly instructed the jury that what the lawyers said was not evidence in the case and should not be considered as such (ECF 15-1, pp. 129, 353), and that the case must be decided only upon the evidence presented at trial. It is generally presumed that jurors follow their instructions. *See, e.g., Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

There is nothing to suggest that the prosecutor's comments violated Petitioner's rights to due process such that they led the jury to convict him on a standard less than beyond a reasonable doubt. Regarding the prosecutor's comments that their job was to "find out about the truth" and that the phone calls showed "the truth," such comments did not shift the burden of proof or direct the jury that it was to follow a different standard of proof. *See United States v. Harper*, 662 F.3d 958 (7th Cir. 2011) (finding that trials are searches for the truth, and that criminal jury trials "service an important 'truth-seeking' function" such that prosecutor's statements in closing argument regarding the "truth" where not improper) (citations omitted).

Further, the prosecutor's comments about the jury no longer having to "presume [petitioner] innocent" at the time of closing, when taken in context,

properly related to her argument that the state had satisfied its burden of proof at that point in the trial. There is plainly nothing in the record to suggest that the prosecutor made these statements in a deliberate attempt to distract the jury or mislead the jurors as to issues of guilt or innocence. *United States v. Hall*, 47 F. 3d 1091, 1098 (11th Cir. 1995) ("Claims of prosecutorial misconduct are fact specific inquiries which must be conducted against the backdrop of the entire record.") (citations omitted).

Finally, although the Fourth DCA found that prosecutor's "I know you will do the right thing" comments improper, *Lucas v. State*, 67 So.3d at 336, the appropriate inquiry here is whether those improper comments had an injurious effect on the outcome of the trial. As presented at trial, there was more than sufficient evidence of guilt against the Petitioner. Particularly, the victim, Ms. Freeman, testified that Petitioner broke into her apartment and attacked her, kneeing her in her eye socket, causing her great bodily harm. Freeman knew Petitioner and identified him as her attacker in a photo lineup and at trial. Based on these facts, under the totality of the circumstances, including the strength of the evidence of the petitioner's guilt, it is apparent that the prosecutor's statements were, at worst, no more than harmless error. *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), quoting *Kotteakos v. United States,* 328 U.S. 750, 776 (1946) (a petitioner is entitled to federal habeas corpus relief only if the constitutional error from his trial had substantial and injurious effect or influence in determining the jury's verdict).

In light of the overwhelming evidence against Petitioner at trial, there is nothing in the record to suggest that the prosecutor's comments, even when taken together, affected the jury's verdict. As such, claim 2 should be denied.

> **Claim 3:** **Petitioner did not receive ineffective assistance of counsel when his lawyer failed to consult and/or hire an expert witness in the area of eye injuries.**

In **claim 3,** Petitioner asserts that he received ineffective assistance of counsel where his lawyer failed to consult and/or hire an expert witness in the area of eye injuries to rebut the State's claim that Ms. Freeman suffered permanent damage as an element of aggravated battery. [ECF 1, p. 5]. Specifically, he claims that his lawyer should have called an expert witness to testify that Freeman's injuries did not constitute "permanent injury or permanent disfigurement" as argued by the State at trial. [*Id*.]. Petitioner also argues that the State abandoned its argument that the battery resulted in "great bodily harm," instead focusing on "permanent damage" and "disfigurement" arguments. [*Id*.]. Finally, Petitioner argues that the trial court erred by failing to hold an evidentiary hearing on this claim on remand after the original order striking his claim was reversed on appeal. [*Id*.].

Petitioner raised this claim in his Rule 3.850 motion for post-conviction relief. [ECF 14-1, Ex. 24]. In response, the State argued that under Florida law, the definition of "great bodily harm" is generally a question of fact for the jury to decide. [*Id*., Ex. 47, p. 393]. Because the jury verdict reflects that the State proved that

Freeman suffered great bodily harm in the form of a fractured orbital bone, the State argued that even if counsel had called an ophthalmologist to testify that her injuries were not permanent, the outcome at trial would not have been different. [*Id*.]. After the trial court denied the claim for the reasons set forth in the state's response [*Id*., Exs. 47, 48], the Fourth DCA *per curiam* affirmed the trial court's denial of the motion. [*Id*., Ex. 52].  As such, the claim is exhausted and ripe for federal habeas review.

Which witnesses to call, if any, is a strategic decision that should seldom be second guessed. *See Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004). "[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit.  A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) (footnotes omitted). In other words, to successfully assert that trial counsel should have called a witness, a petitioner must first make a sufficient showing setting forth the content of the witness's proposed testimony. *See Bray v. Quarterman*, 265 F. App'x 296, 298 (5th Cir. 2008).

Furthermore, a claim of ineffective assistance based on the failure to consult and call an expert requires "evidence of what a scientific expert would have stated" at trial in order to establish *Strickland* prejudice. *Day v. Quarterman*, 566 F.3d 527,

34

538 (5th Cir. 2009) (citation omitted); *accord Delgado v. United States*, 162 F.3d 981, 983 (8th Cir. 1998). A habeas petitioner's unsupported and speculative assertion that testimony of expert witness would have caused the jury to view the evidence differently is insufficient to establish prejudice, as is required to warrant habeas relief on basis of alleged ineffective assistance of counsel. *See Duran v. Walker*, 223 F. App'x 865, 875 (11th Cir. 2007).

Here, Petitioner was charged with aggravated battery against Freeman pursuant to Fla. Stat. § 784.045 by "intentionally or knowingly caus[ing] [her] great bodily harm, permanent disability, *or* permanent disfigurement by fracturing [her] eye socket." [ECF 14-1, Ex. 3] (emphasis added). At trial, Freeman testified she spent three days in the hospital recovering from her injuries, and that as a result of the assault, she needed to wear an eye patch because she was unable to focus both of her eyes at the same time. [ECF 15-1, pp. 170-172]. Freeman also testified that she could not afford surgery necessary to fix her eye, which worsened her condition. [*Id.*, p. 173].

Dr. Clarke testified that he treated Freeman for a fracture of the orbital floor and a fracture of the medial wall of the orbit, and that she was bleeding from her eye. [*Id.*, pp. 217-18]. Clarke consulted an ophthalmologist who stated that Freeman was complaining of double vision and photophobia. [*Id.*, pp. 219-220]. Despite her symptoms, Clarke concluded that Freeman did not need surgery on the bone "at that

35

time," and told her to follow up with the ophthalmologist.  [*Id*., p. 220]. Dr. Clarke stated that after Freeman was discharged from the hospital, he did not know if anything further was done to treat her injuries. [*Id*., p. 223].

In closing argument, the prosecutor specifically argued the following based on the testimony of Clarke and Freeman:

> Now, the second thing that the defendant is charged with is a crime called aggravated battery. An aggravated battery has two elements….*the second element is that when he hit her he intentionally knowingly caused great bodily harm or permanent disability or permanent disfigurement to Lewisha Freeman*.

> You heard testimony. You saw her here. You saw pictures of her injuries. You heard from the doctor saying that she had not one, but two fractures. He literally broke her face by taking her head and slamming it into his knee. And she had problems ever since. She has to wear an eye patch because she still has double vision, blurry vision, that she complained about when she was at the hospital almost two years ago.

[ECF 15-1, pp. 356-57] (emphasis added). The jury was also specifically instructed by the trial court that it could find Petitioner guilty of aggravated battery on a theory of "great bodily harm, permanent disability, *or* permanent disfigurement." [ECF 15-1, p. 387] (emphasis added).

It is clear from the review of the record above, that the state did not abandon its argument that Petitioner caused Freeman "great bodily harm," as he now claims. [ECF 1, p. 5]. Moreover, although Dr. Clarke opined that Freeman did not suffer permanent damage and/or need surgery, it is undisputed that she suffered a fracture

of her eye socket, and that her left eye was completely swollen and closed. Such injuries constitute great bodily harm, which is distinguishable from "slight, trivial, minor or moderate harm…[that]…[is] likely to be inflicted in a simply assault and battery." *Owens v. State*, 289 So.2d 472, 474 (Fla. 2d DCA 1974); *see also Coronado v. State*, 654 So.2d 1267 (Fla. 2d DCA 1995).

Accordingly, Petitioner's assertion that his lawyer could have presented an expert witness that would have testified that Freeman's injuries did not result in great bodily harm is pure speculation, insufficient to satisfy the *Strickland* test. *See Duran v. Walker*, 223 F. App'x at 875. Given the bare and conclusory nature of Petitioner's allegation, and the more than sufficient evidence presented at trial to explain the extent of the victim's injuries, he fails to demonstrate that counsel's performance was deficient for failing to call an expert witness to rebut Dr. Clarke's testimony. *See Smith v. White,* 815 F.2d at 1406–07.

Moreover, to the extent that Petitioner means to suggest that the State committed a *Giglio*[7] violation by allowing Freeman to testify that she needed surgery [ECF 1, p. 5, n. 3], such a claim is without merit. Although Dr. Clarke testified that he did not believe Freeman needed surgery on her orbital bone at the time of

---

[7] *Giglio v. United States*, 405 U.S. 150, 153 (1972) (finding that a defendant is denied due process when the state knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected).

discharge, he told her to follow up with an ophthalmologist, an eye surgeon who works on the eye itself. [ECF 15-1, pp. 219-221]. It is entirely possible that an ophthalmologist who later treated her determined that surgery was necessary because of continued issues with her vision. [*Id.*, p. 172]. Although the nature of the necessary surgery is not clear from Freeman's testimony, there is nothing in the record to suggest that the state allowed her to perjure herself at trial. *See Giglio*, 405 U.S. at 153. Furthermore, as discussed above, whether or not Freeman needed surgery is of no consequence, as the jury could have still found Petitioner guilty under a theory of great bodily harm.[8] Given the foregoing, the state court's resolution of the issues raised in claim 3 during Petitioner's state postconviction proceeding should not be disturbed here. 28 U.S.C. § 2254(d); *Williams v. Taylor*, *supra*.

Regarding part two of Petitioner's claim, that the trial court violated his right to due process by failing to hold an evidentiary hearing after the decision in his initial Rule 3.850 was vacated and remanded, such a claim is also without merit. As discussed in the procedural history above, when the trial court struck Petitioner's initial Rule 3.850 motion on the basis that he failed to sufficiently plead his "expert

---

[8] Petitioner appears to suggest that had counsel called an expert witness to testify that the witness would have testified that Freeman's injuries were not "permanent," and the jury would have only convicted him of battery, thereby lessening his exposure at sentencing. [ECF 1, pp. 5-6]. However, as discussed above, the evidence presented at trial clearly established that Freeman suffered great bodily harm, sufficient to sustain his aggravated battery conviction. Thus, there is no reasonable probability that had counsel presented an expert witness, that the outcome at trial would have been different as required by the second prong of *Strickland*. *See e.g. Evans v. Cockrell*, 285 F.3d 370, 377-78 (5th Cir. 2002).

witness" claim, he appealed. The Florida Supreme Court found that Petitioner had sufficiently plead his claim under Florida law even though he did not name a specific expert and attest that the expert would have been able to testify at trial. [ECF 14-1, Ex. 40]. On remand, the trial court granted an evidentiary hearing on the claim after the state conceded one was necessary. [*Id.*, Exs. 41, 42]. The trial court later vacated the order on request of Petitioner's post-conviction counsel to allow for further responses. [*Id.*, Exs. 43-44]. After additional briefing, the trial court summarily denied all of Petitioner's claims based on the state's responses without an evidentiary hearing. [*Id.*, Ex. 48].

Petitioner's argument that the trial court failed to comply with the mandate is not cognizable in the instant habeas action. *See Moore v. Steward*, 948 F.Supp.2d 826, 858 (W.D. Tenn. 2013). It is well-settled in the Eleventh Circuit that a prisoner's challenge to the process afforded him in a state post-conviction proceeding does not constitute a cognizable claim for habeas corpus relief. This is so because such a claim represents an attack on a proceeding collateral to the prisoner's confinement, and not the confinement itself. *Carroll v. Secretary, DOC, Fl. Attorney Gen.*, 574 F.3d 1354, 1366 (11th Cir. 2009); *Spradley v. Dugger,* 825 F.2d 1566, 1568 (11th Cir. 1987) (holding that habeas petitioner's claim of error in Rule 3.850 proceeding did not state a basis for habeas relief because "[n]either the state court's failure to hold a hearing ... nor its failure to attach the relevant portions of the record in any way undermines

the validity of petitioner's conviction [and thus went] to issues unrelated to the cause of petitioner's detention"). Thus, whether the trial court was barred based on the doctrine of judicial estoppel, as petitioner argues in his reply [ECF 29, p. 9], such an argument is unpersuasive because it challenges the resolution of Petitioner's post-conviction proceeding.

Moreover, Petitioner's reliance on *Holder v. Gualtieri*, No. 8:14-CV-2052-T-33JSS, 2015 WL 4079844, at *3 (M.D. Fla. Jul. 6, 2015) in his reply [ECF 29, p. 9] is misguided because the case, a civil suit against child protective services, refers to what Florida law "mandates" by statute regarding officials' affirmative duty to ensure the well-being of children in their custody. *Holder*, 2015 WL 4079844, at *3. It has nothing to do with the effect of the Florida Supreme Court's mandate in a criminal case on the lower courts. *Id*. Given the foregoing, claim 3 should be denied.

> ### Claims 4 & 6:  *Petitioner did not receive ineffective assistance of counsel when his lawyer failed to object to the State's introduction of evidence regarding Glushko and Petitioner's identities.*

Claims 4 and 6 are sufficiently related to address together. In **claim 4,** Petitioner argues that he received ineffective assistance of counsel where his lawyer failed to object to Glushko's out-of-court statements on the basis that the State failed to establish her identity. [ECF 1, p. 7]. In **claim 6**, Petitioner asserts that his lawyer also failed to object to the admission of Petitioner's jail calls on the basis that the prosecutor had not proven Petitioner's identity. [*Id*., p. 9]. Petitioner claims that had

counsel objected to the admission of these statements and calls on this basis, that the trial court would have sustained the objections, and excluded the evidence, creating a reasonable probability that the outcome at trial would have been different. [*Id*., pp. 7, 9-10]. Petitioner exhausted claim 4 in state court.[9] [ECF 14-1, Exs. 45, 48]; *Lucas v. State*, 230 So.2d 1219 (Fla. 4th DCA 2017).

Florida Statute 90.901 provides: "Authentication or identification of evidence is required as a condition precedent to its admissibility. The requirements of this section are satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." "Once a prima facie showing of authenticity is made pursuant to this section, however, the evidence may be admitted, and the

---

[9] Regarding the exhaustion of claim 6, the record is unclear. While the trial court's order denying Petitioner's amended Rule 3.850 motion did not expressly address "Ground V" of the motion (where Petitioner argued that counsel ineffectively failed to object to testimony regarding his voice identification on the jail calls), it denied the motion in its entirety "for the reasons set forth in the state's responses." [ECF 14-1, p. 397]. However, review of the state's underlying response reveals that the state argued that "Ground V" was untimely filed. [ECF 14-1, p. 386]. Nevertheless, the state concedes in its response that the ground, raised as claim 6 here, was properly exhausted. [ECF 13, p. 10]. As such, it has expressly waived any exhaustion argument on this issue. *See Vazquez v. Sec'y, Fla. Dep't of Corr.,* 827 F. 3d 964, 967 (11th Cir. 2016).

Nevertheless, with respect to claim 6, this court need not resolve whether the claim was exhausted. As will be demonstrated in more detail below, under *de novo* review, Petitioner's claim fails. When it is unclear or less efficient to resolve whether § 2254(d)'s additional restriction applies, federal courts may also deny writs of habeas corpus under § 2254 by engaging in *de novo* review, a more favorable standard, as a habeas petitioner would surely not be entitled to a writ under § 2254(d) if their claim would fail under *de novo* review. *See, e.g., Berghuis v. Thompkins,* 560 U.S. 370, 390 (2010); *Hittson v. GDCP Warden*, 759 F.3d 1210, 1248 (11th Cir. 2014); *Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1109-10 (11th Cir. 2012).

ultimate question of authenticity is left for the jury to determine." *Jackson v. State*, 979 So.2d 1153, 1154 (Fla. 5th Cir. 2008).

Regarding voice identification, "Florida courts have consistently allowed law enforcement officers to identify the voice of a defendant where the officer has gained familiarity with the voice." *Johnson v. State*, 252 So.3d 1114, 1118 (Fla. 2018) (citations omitted). A "familiarity" means that "prior to trial, the identification witness must have gained familiarity with the defendant that assists the witness in identifying him." *Id*. (citing *Johnson v. State*, 215 So.3d 644, 652 (Fla. 5th DCA 2017)). "[F]amiliarity with a defendant's voice acquired during an ongoing investigation may constitute the requisite prior special familiarity for voice identification testimony." *Id*. Under federal law, "testimony by a witness that he recognized the accused by his voice is admissible, provided that the witness has some basis for comparison of the accused's voice with the voice which he has identified as that of the accused." *See U.S. v. Ladd*, 527 F.2d 1341, 1343 (5th Cir. 1976).

In the instant case, Kathleen Casey, the Detention Communications Coordinator at the Broward County Jail, testified at trial that 55 phone calls were made from the Broward County Jail to a phone number registered to Lauren Glushko. [ECF 15-1, pp. 249, 278-88]. The person associated with the account used to make the phone call was Petitioner. [*Id*., pp. 289-290]. In the calls played to the

42

jury, the male speaker refers to the female speaker as "Lauren" [*Id.*, p. 292], and the female speaker refers to the male speaker as "Eric." [*Id.*, p. 295]. Detective Moody also testified that he had the opportunity to speak with Petitioner and hear his voice. [*Id.*, p. 230]. Moody stated that he listened to the jail calls and the male speaker sounded like Petitioner, whom he had interviewed. [*Id.*, p. 231].  Officer Stenger testified that he spoke with Lauren Glushko at the scene of the crime, who stated that she had an altercation with Petitioner. [*Id.*, p. 195-96].

Given the evidence above, the State established a prima facie case by evidence sufficient to support a finding that both Glushko and Petitioner participated in the jail calls. Therefore, any objection to the admission of the calls on authenticity grounds would have been overruled by the trial court. Accordingly, Petitioner fails to establish that counsel's performance was deficient for failing to object to this evidence.

To the extent that Petitioner challenges the admission of Officer Stenger's identification of Lauren Glushko as inadmissible hearsay, such a claim is also without merit. While it is true that Florida law prohibits an officer from testifying about a non-testifying witness's identity as impermissible hearsay, *Holborough v. State*, 103 So.3d 221 (Fla. 4th DCA 2012), Petitioner forfeited any right to challenge the testimony regarding Glushko's identity at trial. As previously discussed above, Glushko's statements to law enforcement were admissible based on the doctrine of

forfeiture. Had Petitioner not wrongfully procured Glushko's unavailability at trial, she would have testified in court to establish her identity. Because she was unable to testify due to Petitioner's own wrongdoing, Stenger, Moore, and Freeman were permitted to testify to her identity at trial.

Moreover, even if the testimony as to the identity of Lauren Glushko was inadmissible such that any objection to the testimony would have been sustained, there still would have been more than sufficient evidence against the Petitioner at trial. Particularly, Freeman identified Petitioner and admitted that she saw him beating up a female. [ECF 15-1, p. 155]. After she let the female into her apartment, Petitioner proceeded to break down the door and attack Freeman, kneeing her in her eye and fracturing here eye socket. [*Id.*, pp. 170-71]. This testimony establishes that Petitioner committed aggravated battery and burglary with a battery as charged in the information. [ECF 14-1, Ex. 3]. Glushko was not the named victim in the case, her name was not a material part of the case, and, therefore, the state was not required to prove her identity as an element of the crimes charged. As such, even if the court had sustained an objection to the testimony regarding Glushko's identity at trial, there is no reasonable probability that the trial would have resulted in a different outcome. Accordingly, Petitioner cannot demonstrate any prejudice under the second prong of *Strickland*.

Given the foregoing, the state court's admission of the evidence regarding Glushko, raised as claim 4 here, did not render the trial fundamentally unfair, and the state court's resolution of this claim should not be disturbed here. *Williams v. Taylor*, supra. Moreover, for the reasons set forth above, claim 6 is without merit even when looking at the issue under the *de novo* review standard. As such, claims 4 and 6 should be denied.

> **Claim 5:**   ***Petitioner did not receive ineffective assistance of counsel when his lawyer failed to use a police report to impeach victim Lewisha Freeman regarding her inconsistent statements.***

In **claim 5**, Petitioner alleges that he received ineffective assistance of counsel where his lawyer failed to use a police report to impeach Ms. Freeman regarding her inconsistent statements about Petitioner's identity. [ECF 1, p. 8]. Specifically, he claims that the police report showed that Ms. Freeman claimed that she did not know the name or identity of the assailant. [*Id*.]. As such, counsel should have impeached her with this inconsistency on cross-examination. [*Id*.].  This claim was exhausted in state court and is ripe for federal review.

The decision to cross-examine a witness and the manner in which it is conducted are tactical decisions "well within the discretion of a defense attorney." *Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001) (quoting *Messer v. Kemp*, 760 F.2d 1080, 1090 (11th Cir. 1985)). In order to establish prejudice, a habeas petitioner

must show at least one "specific instance where cross-examination arguably could have affected the outcome . . . of the trial." *Id. (*quoting *Messer*, 760 F.2d at 1090).

Here, review of the record reveals that Freeman's testimony at trial was not inconsistent with Petitioner's claim that she told police that she did not know the name or identity of her assailant. It is true that Freeman stated on cross that she knew Petitioner's name was "Eric," but did not know his last name at the time of the incident [*Id*., pp. 184]. However, on cross-examination, she also admitted that the police came to her hospital room and that she was unable to identify anyone on two separate occasions [ECF 15-1, p. 181]. Later, after she was released from the hospital, however, Freeman identified Petitioner as the perpetrator. [*Id*., p. 182]. Counsel further cross-examined Freeman on a contradiction in her deposition testimony where she stated that Petitioner was bald. [*Id*., pp. 184-84]. When cross-examining Stenger, counsel confirmed that Ms. Freeman told him that she did not know Glushko or Lucas. [*Id*. p. 208]. Thus, while trial counsel did not directly question Freeman regarding the police report, he effectively brought the contradictions in her testimony before the jury through his cross-examination.

However, even if counsel had cross-examined Freeman with the police report at trial, there is no reasonable probability that the outcome at trial would have been different. Freeman acknowledged that she could not identify anyone immediately after the incident because of her injuries and the fact that she was on medication.

[ECF 15-1, p. 191]. Moreover, counsel thoroughly harped on Freeman's initial failure to identify Petitioner in his closing argument. [ECF 15-1, p. 368]. Even with the arguments set forth by counsel, the jury was unpersuaded and found Petitioner guilty in light of the overwhelming evidence against him. Accordingly, Petitioner fails to demonstrate any prejudice resulting from counsel's alleged deficient performance under *Strickland*. The state court's resolution of this claim should, therefore, be left undisturbed. *Williams v. Taylor, supra.* Claim 5 should be denied.

> ***Claims 7 & 9:***     ***Petitioner did not receive ineffective assistance of counsel when (1) his lawyer failed to investigate Freeman's relationship with Janet Landry and (2) failed to call Landry as a witness at trial.***

Claims 7 and 9 are sufficiently related to address together. In **claim 7**, Petitioner asserts that he received ineffective assistance of counsel, where his lawyer failed to investigate the relationship between Freeman and Landry, Freeman's boss. [ECF 1, p. 10]. Specifically, Petitioner claims that there were significant discrepancies between Landry's statements at her deposition and Freeman's testimony at trial.[10] [*Id.*, p. 11]. In **claim 9**, Petitioner alleges that his lawyer was

---

[10] According to Petitioner, Janet Landry stated in deposition that there was a rift between her and Freeman over money, and that Glushko had no visible injuries on her at the time of the alleged incident. [ECF 1, p. 11]. Petitioner claims that the "reality" of the incident is that Freeman and Landry stole his television and the argued over the "spoils" from the theft. [*Id.*]. Petitioner further asserts the argument escalated; and Landry, actually, is the one that inflicted the injuries upon Freeman. [*Id.*]. The two decided to pin the altercation on Petitioner. [*Id.*]. Furthermore, Lauren Glushko refused to cooperate with the defense (or the state) because Petitioner's former defense counsel "alienated [her] when he attempted to establish a sexual relationship with her." [*Id.*].

ineffective for failing to call Landry as a witness. [ECF 1, pp. 13-14]. As discussed above, these claims are unexhausted as they were not raised in state court. The Respondent argues that these claims should be dismissed as procedurally barred because Petitioner has failed to establish a substantial ineffective assistance of counsel claim as required by *Martinez*. [ECF 13, pp. 38, 44].

Under federal law, defense counsel need only conduct a pretrial investigation that is reasonable under the circumstances. *Walker v. Sec'y, Florida Dep't. of Corr.*, 495 F. App'x 13, 16 (11th Cir. 2012) (internal citations omitted). The manner of investigating or presenting a particular line of defense "is a matter of strategy and is not ineffective unless the petitioner can prove that the chosen course, in itself, was unreasonable." *Id.* (internal citations omitted).

Here, Petitioner argues that there are four key inconsistencies between Landry and Freeman's testimony: (1) Landry stated in deposition that Freeman and Petitioner knew each other but did not like each other; (2) Landry stated in deposition that Freeman never opened the door and spoke to her prior to the burglary; (3) Landry stated that Glushko was standing in the same area as Freeman when

---

It should be noted that Petitioner's argument that Glushko refused to cooperate with the parties because of his former defense counsel's alleged inappropriate actions is wholly contradicted by the record. Multiple jail calls between Petitioner and Glushko at trial showed that he specifically intended to threaten and dissuade her from testifying at trial, resulting in her unavailability at trial. Thus, Petitioner's allegations as to this point appear to be entirely disingenuous.

Petitioner struck Freeman; and (4) prior to the burglary, Freeman was inside of her bedroom calling 911 when Glushko busted open her apartment door, but Landry clearly stated that Freeman's door was closed, and that she witnessed Petitioner kick Freeman's door open with his right leg. [ECF 1, p. 14].

As previously discussed, Freeman testified that Petitioner worked in the same building as her. [ECF 15-1, p. 161]. After she saw Petitioner grabbing Glushko by her throat, she walked towards her bedroom and thought she had locked the bottom lock of her door when Glushko came busting through, closing the door behind her.[11] [*Id.*, p. 156]. Freeman also testified that when Landry came to the door, she did not open it, but told Landry what was happening through the door [*Id.*, pp. 168-169]. Petitioner stopped banging on her door and left, only to return quickly to break down the door. [*Id.*]. The battery concluded when Landry ran inside the apartment and Petitioner fled. [*Id.*, p. 171]. Freeman did not see the door open, and could not recall how many times Petitioner hit her, but stated the she had her hands up in front of her face while she was in the kitchen. [*Id.*, p. 170].

Landry's deposition testimony regarding the circumstances of the battery on Freeman, while not identical to Freeman's account of the incident, was largely

---

[11] Petitioner mischaracterizes Freeman's trial testimony on this point. Freeman stated that she was on the way to her bedroom when Glushko came into her apartment, not that she was in her bedroom. [ECF 15-1, p. 156]. Freeman testified that she "thought" she locked the bottom lock. [*Id.*]. This testimony is not inconsistent with Petitioner later breaking down the door.

consistent with Freeman's testimony at trial. Specifically, she testified that she saw Petitioner beating on the door, talked to Freeman through the door,[12] and left with Petitioner. [ECF 15-4, p. 16]. Then, Petitioner returned to the apartment, kicked in the door, and attacked Freeman in the kitchen. [*Id.*, pp. 17-18]. Glushko was hiding in the bathroom or was in the middle of the dining room and living room at the time of the incident. [ECF 15-5, p. 8; ECF 15-4, pp. 29-30].[13] Landry also stated that Freeman and Petitioner knew each other from work, but didn't like each other. [*Id.*].

Therefore, the only inconsistencies between Landry's testimony and Freeman's testimony appear to be (1) Glushko had no visible injuries [ECF 15-5, p. 8], (2) Glushko was or was not in the bathroom at the time of the incident, and (3) Petitioner and Freeman did not like each other. However, Glushko was not the victim in the case. As previously discussed, the State had to prove Petitioner's guilt only as to the burglary and aggravated battery of Freeman. Calling Landry as a witness, then, would have bolstered and corroborated Freeman's account of the incident. Although

---

[12] Petitioner mischaracterizes Landry's deposition testimony on this point. [ECF 1, p. 14, n. 12]. Specifically, Landry testified that when she went to the door to figure out what was happening, Freeman stated that she wasn't opening the door because of Petitioner and that she had called the police. [ECF 15-4, pp. 16-17]. Freeman testified at trial that she kept the door closed, but told Landry what was happening through the door. [ECF 15-1, pp. 168-169]. These accounts are not inconsistent.

[13] Petitioner states that Landry said that Glushko was standing in the same area as Freeman when Petitioner struck her, but in her interview with police, she stated that Glushko was hiding in the bathroom. [ECF 15-5, p. 8]. Her testimony in her deposition was that Glushko was in the middle of the dining room and living room. [ECF 15-4, pp. 29-30].

the fact that Freeman "didn't like" Petitioner may have related to Freeman's motive

to lie, given the obvious disadvantages to calling Landry as a witness, it is likely that

counsel made a reasonable strategic decision not to call her.[14] *See Walker v. Sec'y,*

*Florida Dep't. of Corr.*, 495 F. App'x at 16.

Moreover, given Landry's pre-trial statements, there is plainly nothing in the

record to suggest that Freeman and Landry conspired to steal Petitioner's television

and then frame him for aggravated battery, as he now claims.[15] Freeman testified

that Petitioner was evicted from his apartment *after* the incident. [ECF 15-1, p. 192].

She also stated that she saw Petitioner's television in Landry's apartment *after* the

incident, [*Id.*, p. 190]. But, Landry denied being involved in stealing the television,

and did not implicate Freeman during her deposition. [ECF 15-4, p. 31]. Thus, the

---

[14] Finally, to the extent that Petitioner appears to suggest [ECF 1, p. 15, n. 14] that counsel ineffectively acquiesced to the State's pretrial motion in limine to preclude him from making any mention of Janet Landry at trial, such a claim is without merit. While it does not appear that the State's motion in limine was made part of record provided by the state in this matter, it would not have been error for the State to move the court to preclude the defense from commenting on its failure to call Landry as a witness at trial. Under Florida law, when a witness is equally available to both parties, "no inference should be drawn or comments made on the failure of either party to call the witness." *Haliburton v. State*, 561 So.2d 248, 250 (Fla. 1990) (internal citations omitted).

[15] There is no support, other than Petitioner's fantastical allegations here regarding the relationship between Freeman and Landry, to support his claim that they conspired to frame him for the battery to avoid going to prison. Such a theory of defense is wholly contradicted by the jail calls presented at trial, where Petitioner threatened Glushko for telling the "truth" to authorities. [ECF 15-1, p. 295].

Furthermore, to the extent that he articulates all the manners in which counsel should have investigated this potential theory of defense in his reply, such allegations should not be considered. A traverse is not the proper vehicle to raise for the first-time facts to support a ground for relief. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir.1994)

only evidence to support the claim that Landry stole Petitioner's television was Freeman's testimony that she saw the television in Landry's apartment more than a month after the incident, and Freeman's injury, had occurred.

Nevertheless, counsel harped on Freeman's possible motive during closing argument, where he argued that this "stolen T.V." created a motive to lie and fabricate the allegations against Petitioner. [ECF 15-1, pp. 369-370]. The jury, however, was unpersuaded, and found Petitioner guilty in light of the overwhelming evidence presented at trial. As such, even if counsel had "investigated" Landry and called her as a witness, there is no reasonable probability that the outcome at trial would have been different. Because Petitioner's claims 7 and 9 are without merit, his claims cannot overcome the procedural bar and are precluded from federal review. *See Martinez*, 566 U.S. at 9.

> **Claim 8:    *Petitioner did not receive ineffective assistance of counsel when his lawyer failed to present an alibi defense.***

In **claim 8**, Petitioner alleges that he received ineffective assistance of counsel where his lawyer failed to present a viable alibi defense. [ECF 1, p. 12]. Specifically, Petitioner claims that he informed counsel that he was somewhere else at the time of the alleged incident, and that Alisa Catoggio would testify to that fact. [*Id*.]. Petitioner alleges that counsel told him that he would be waiving his right to challenge the evidence of jail calls and Glushko's hearsay statements to Officer Stenger should he proceed with an alibi defense. [*Id*.]. Petitioner alleges that had

counsel not misadvised him, he would have moved forward with the alibi defense. [*Id*.].

The Respondent argues that this claim should be dismissed as procedurally barred because Petitioner has failed to establish a substantial ineffective assistance of counsel claim as required by *Martinez*. [ECF 13, p. 41]. The Respondent is correct.

Based on Catoggio's deposition testimony, it is unlikely that she would have been a credible witness at trial. Catoggio, who stated in her deposition that she and Petitioner had a sexual relationship, claimed that she picked up the Petitioner from a friend's house the evening before the incident and took him to her home. [ECF 15-3, pp.4-5]. She first claimed that he received a telephone call in the morning saying that an incident had occurred and instructed Catoggio to go to his apartment to retrieve clothes and a toothbrush for him because he was not feeling well and did not have his car. [*Id*., p. 7]. Later in the deposition, she claimed that after picking up the Petitioner the night before, they watched movies and then went to sleep around 1 or 2 a.m. [*Id*.]. Then, *Petitioner woke to a phone call regarding the incident and asked Catoggio to go get his clothes from his apartment because he "didn't know what he was going to run into" and wanted Catoggio to "check it out."* [*Id*., pp. 9, 11]. After she left her apartment around 8 a.m. and went to Petitioner's apartment, she ran into Landry who told her what Petitioner had done, to which Catoggio claimed that she

responded, "well that's impossible because he was with me." [*Id.*].  She did not stay to speak with the police because she "didn't feel it necessary to give a statement." [*Id.*, pp. 15-16]. When she returned to her house, she gave Petitioner a ride to the same place she had picked him up from the night before. [*Id.*, p. 17].

According to Catoggio, Petitioner later told her that he had gotten into a fight with his ex-girlfriend, Glushko, and Glushko claimed that he beat her up or beat up somebody else because of the situation. [*Id.*, p. 18]. Petitioner didn't know what to do and was scared. [*Id.*]. Catoggio testified that she never went to the police to speak with them, but did speak to Petitioner's previous trial counsel, Mr. Cotrone, in July 2008, more than seven months after the incident. [*Id.*, p. 22]. Catoggio also stated that she heard that Glushko had a fake tooth. [*Id.*, p. 27]. Petitioner shut his phone off after the incident. [*Id.*, p. 32].

As discussed above, the night of the incident, Catoggio was sleeping between 1 a.m. and 8 a.m. [ECF 15-3, p. 9, 12]. As the Respondent suggests, Petitioner still had more than enough time to leave Catoggio's house, commit the crime at 5:30 a.m., and return while Catoggio slept. [ECF 13, p. 40]. Catoggio's failure to speak to the police about the incident, and her reluctance to speak about the incident until more than seven months after Petitioner's arrest could have also been used to attack her credibility had she testified at trial. Catoggio also would have had a clear and

obvious motive to lie in order to protect Petitioner, with whom she was involved in a sexual relationship.

There were also material contradictions within Catoggio's own statements during the deposition. As emphasized above, in one part of the deposition, Catoggio stated that Petitioner wanted her to go to his apartment to get him a change of clothes because he didn't have his car and was "sick," [ECF 15-3, p. 7], while in another part of the deposition, she stated that Petitioner said some "bulls---- went down at [his] place," and asked her if she would mind going over to "check it out" and that he wouldn't go back to his apartment "because he didn't know what he was going to encounter." [*Id.*, pp. 10-11].

Under federal law, whether to call a particular witness or cross-examine certain witnesses are generally questions of trial strategy. *See United States v. Costa*, 691 F.2d 1358, 1364 (11th Cir. 1982). Nevertheless, where counsel fails to investigate and interview promising witnesses, and therefore "ha[s] no reason to believe they would not be valuable in securing [defendant's] release," counsel's inaction constitutes negligence, not trial strategy. *Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1992) (quoting *United States ex rel. Cosey v. Wolff*, 727 F.2d 656, 658, n.3 (7th Cir. 1984)). Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. *Strickland*, 466 U.S. at 690-91. Moreover, "[w]hich witnesses, if any, to call, and when to call

them, is the epitome of a strategic decision, and it is one that [courts] will seldom, if ever, second guess." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995).

Moreover, Catoggio stated in deposition that she went to Petitioner's apartment around 8 a.m., and that Landry told her that the police were on their way. However, there was more than sufficient evidence presented at trial to show that the police arrived on scene quickly after the incident occurred around 5:30 a.m. Given the credibility issues with Catoggio's testimony, a reasonable attorney could have found that pursuing an alibi defense and presenting her as a witness based on her deposition testimony would have been unsuccessful. *See United States v. Costa*, 691 F.2d at 1364.

Finally, even if counsel had presented Catoggio as an alibi witness, there is nothing to suggest that the outcome at trial would have been different given the credibility issues with her deposition testimony. This is especially true where Plaintiff's alibi defense was directly contradicted by the evidence presented at trial. Specifically, the incriminating jail calls between Petitioner and Glushko revealed that he was concerned about Glushko cooperating with the state and telling the "truth" about the incident. [ECF 15-1, p. 295]. Moreover, both Freeman and Glushko (through Officer Stenger's testimony) identified Petitioner as the perpetrator of the aggravated battery. Accordingly, Petitioner fails to demonstrate any prejudice under the second prong of *Strickland*. Given the foregoing, Petitioner claim 8 is without

merit and is procedurally defaulted from federal review. *See Martinez*, 566 U.S. at 9.[16]

## VIII. Cautionary Instruction Re: Clisby Rule

The Court is mindful of the *Clisby* rule that requires district courts to address and resolve all claims raised in habeas corpus proceedings, regardless of whether relief is granted or denied. *Clisby v. Jones*, 960 F.2d at 936-36; *Rhode v. United States,* 583 F.3d 1289, 1291 (11th Cir. 2009) (holding that *Clisby* applies to § 2255 proceedings). However, nothing in *Clisby* requires, much less suggests, consideration of claims or arguments raised for the first time in objections. If the Petitioner attempts to raise arguments or further factual support for his claims in objections, the court should exercise its broad discretion and refuse to consider the arguments not raised before the magistrate judge in the first instance. *See Williams v. McNeil,* 557 F.3d 1287 (11th Cir. 2009) (*citing Stephens v. Tolbert,* 471 F.3d 1173, 1175 (11th Cir. 2006) (finding no abuse of discretion by the district court in declining to consider timeliness argument that was not presented to the magistrate judge)). This is so because "[P]arties must take before the magistrate, 'not only their best shot but all of the shots.'" *See Borden v. Sec'y of Health & Human Services*, 836

---

[16] To the extent that Petitioner alleges throughout his reply, *see e.g.* [ECF 29, p. 21], that counsel was ineffective for failing to argue/present witnesses to testify that Glushko had a fake, removable tooth, such an argument is unpersuasive. As discussed throughout this report, Glushko was not a named victim in the case, and the state did not have to prove any elements of the charges in the information as to her. Moreover, even if the tooth was removable, it still could have been knocked out during Petitioner's battery on Glushko.

F.2d 4, 6 (1st Cir. 1987) (*quoting Singh v. Superintending School Committee of City of Portland*, 593 F. Supp. 1315, 1318 (D. Me. Sept. 27, 1984).

Finally, the Court has considered all the Petitioner's claims for relief. *See Dupree v. Warden,* 715 F.3d 1295 (11th Cir. 2013). For all his claims, Petitioner has failed to demonstrate how the state courts' denial of his claims, to the extent they were considered on the merits in the state forum, were contrary to, or the product of an unreasonable application of, clearly established federal law. To the extent they were not considered in the state forum, as discussed in this report, none of the claims individually, nor the claims cumulatively warrant relief. Whether a precise argument, subsumed within any of the foregoing grounds for relief, was not specifically addressed here or in the state forum, all arguments and claims were considered and found to be devoid of merit, even if not discussed in detail here.

### IX. Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the Petitioner to establish the need for a federal evidentiary hearing. *See Chavez v. Sec'y, Fla. Dep't of Corr.,* 647 F.3d 1057, 1060 (11th Cir. 2011). To determine whether an evidentiary hearing is needed, the question is whether the alleged facts, when taken as true, are not refuted by the record and may entitle a petitioner to relief. *Schriro v. Landrigan,* 550 U.S. 465, 474 (2007); *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1318-19 (11th Cir. 2016), *cert. den'd*, 137 S.Ct. 2245 (2017). The pertinent facts of this case are

fully developed in the record before the Court. Because this Court can "adequately assess [petitioner's] claim[s] without further factual development," *Turner v. Crosby*, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing is not warranted here.

## X. Certificate of Appealability

A prisoner seeking to appeal a district court's final order denying his petition for writ of habeas corpus has no absolute entitlement to appeal but must obtain a certificate of appealability ("COA"). *See* 28 U.S.C. § 2253(c)(1); *Harbison v. Bell,* 556 U.S. 180, 183 (2009). This Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). Where a district court has rejected a petitioner's constitutional claims on the merits, the Petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *See Slack v. McDaniel,* 529 U.S. 473, 484 (2000). However, when the district court has rejected a claim on procedural grounds, the Petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* Upon consideration of the record, this court should deny a certificate of

appealability. Notwithstanding, if Petitioner does not agree, he may bring this argument to the attention of the District Judge in objections.

## XI. Conclusion

Based upon the foregoing, it is recommended that:

1.    the federal habeas petition be DENIED on the merits;

2.    final judgment be entered in favor of Respondent;

2.    a certificate of appealability be DENIED; and,

3.    the case CLOSED.

Objections to this report may be filed with the District Court within fourteen days of receipt of a copy of the report. Failure to file timely objections shall bar Petitioner from a *de novo* determination by the District Court Judge of an issue covered in this report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the District Court Judge, except upon grounds of plain error or manifest injustice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).

Signed this 23rd day of July, 2019.

_____
UNITED STATES MAGISTRATE JUDGE

cc:   Eric Lucas
W07313
Okeechobee Correctional Institution
Inmate Mail/Parcels
3420 NE 168th Street
Okeechobee, FL 34972
PRO SE

Luke Robert Napodano
Office of the Attorney General
1515 North Flagler Drive
Suite 900
West Palm Beach, FL 33401
561-837-5000 x179
Email: luke.napodano@myfloridalegal.com